Kevin CASEY, Petitioner,

v.

Matthew FRANK, Respondent.

No. 00–C–1095.

United States District Court,
E.D. Wisconsin.

Nov. 24, 2004.

Kevin Casey, Pro se, for Plaintiff or Petitioner.

William Ganser, for Defendant or Respondent.

### DECISION AND ORDER

ADELMAN, District Judge.

Pro se petitioner Kevin Casey seeks a writ of habeas corpus challenging his conviction by a jury of sexually assaulting his step-daughter, Kimberly, and a neighbor girl, Melissa, for which he was sentenced to fifteen years in prison followed by twenty years of probation. In his petition, he argues that (1) his lawyers were ineffective, primarily for failing to obtain the case file from his previous attorney, which file contained witness statements undermining the credibility of his accusers; (2) he was deprived of the right of confrontation when the court excused Kimberly from testifying at his preliminary hearing and permitted her to testify via videotaped deposition at trial; (3) he was denied due process when the court precluded him from introducing Kimberly's prior and allegedly false accusation of sexual assault against her aunt; and (4) he was denied due process because of the cumulative effect of the trial court's errors.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Although petitioner was tried in 1998, the events relevant to the case commenced in 1992.

### A. The 1993 Charge Relating to Melissa

In the summer of 1992, petitioner moved into the home of his girlfriend and soon to be wife, Mary Jo, and her children Kimberly, six, and Timmy, four, in Appleton, Wisconsin. Melissa, who was twelve, lived in the neighborhood. In May 1993, based on Melissa's allegation and the supporting statement of her friend, Lindsey, the district attorney charged petitioner with sexually assaulting Melissa in September 1992. Eugene Bartman, a public defender, was appointed to represent petitioner. Bartman assigned investigator Terry Young to interview potential witnesses. The statements of some of the witnesses raised questions about the credibility of Melissa's allegation. Petitioner took two polygraph tests, the first of which was inconclusive, possibly due to a medical condition, but he passed the second. Subsequently, the district attorney dismissed the charge without prejudice.

### B. Kimberly's 1994 Allegation

In late 1993 and early 1994, petitioner and Mary Jo discussed moving to Oklahoma. In March 1994, Kimberly told friends and her grandmother that petitioner touched her sexually. The county social services department investigated the matter, but the district attorney brought no charges against petitioner. However, custody of Kimberly and Timmy was subsequently transferred to their biological father, Tim, and his wife, Dawn. In April 1994 petitioner and Mary Jo moved to Oklahoma. Kimberly remained in Wisconsin with her father and step-mother.

### C. The 1997 Charges

In February 1997, Kimberly told a school social worker that in 1992 petitioner assaulted her and that in the same year she witnessed petitioner engaging in sexual activity with Melissa. As the result of Kimberly's statements, in October 1997, the district attorney charged petitioner with assaulting Kimberly in late summer or early fall of 1992, and re-issued the previously dismissed charge that petitioner

assaulted Melissa in September 1992. In 1997, Melissa was seventeen and Kimberly eleven.

## D. Pretrial Proceedings

Petitioner retained attorney Thomas Zoesch. Zoesch asked Bartman for copies of two documents but did not request Bartman's entire file. He did not obtain the statements that investigator Young took or independently discover the witnesses who made the statements.

The court held a preliminary hearing at which Melissa testified but Kimberly did not. Over counsel's hearsay objection, the court permitted Kimberly's therapist, Mark Reich, to testify as to what she told him about the assaults. At the close of the hearing, the court bound petitioner over for trial.

Counsel then moved to sever the two counts, arguing that petitioner would be prejudiced if a single jury heard both girls' allegations. The state responded that the charges should be tried together because the allegations were similar in type and time, Kimberly would have to testify on both charges because she was a witness to the alleged assault on Melissa, and evidence relating to one count would likely be admitted as evidence of intent on the other count. Based on the state's arguments, the court denied the motion.

The state moved to allow Kimberly to testify by videotaped deposition pursuant to Wis. Stat. § 967.04(7). Therapist Beth Young–Verkuilen and Kimberly's stepmother, Dawn, testified that Kimberly was apprehensive about testifying with petitioner present and urged that she be permitted to testify via videotaped deposition conducted in a small room with petitioner behind a one-way mirror. Over counsel's objection, the court granted the motion.

The state also moved in limine to preclude petitioner from presenting evidence that in 1991 Kimberly falsely accused her then-twelve year old aunt, Kristine Kain, of sexually assaulting her. The state relied on the social services investigative report on the allegation, which characterized Kimberly's claim against Kristine "as being vague and uncertain as to dates." (Answer Ex. I at 3.) Over counsel's objection, the court granted the state's motion.

## E. The Trial

At trial, Melissa testified that in 1992 she often visited petitioner's house while Mary Jo was at work to play with the children and help petitioner watch them, and that Lindsey sometimes accompanied her. She testified that on one occasion in September 1992 petitioner took her into his bedroom, touched her private part, removed his shorts and underwear and her shorts and underwear, got on top of her on the bed and put his penis in her vagina. She testified that on that day she was not wearing shoes. She stated that at one point she saw Lindsey in the doorway, that petitioner told Lindsey to get out and later threatened to kill her and Lindsey if they told anyone what happened. She testified that after the incident, she was afraid of petitioner and stayed away from his house.

On cross examination, Melissa had difficulty recalling the details of the assault: for example, she could not remember what time she arrived at petitioner's house or whether, when the assault occurred, the bedroom door was open or closed. At one point, she and counsel engaged in the following colloquy:

Q All right. So at the point where if, when according to you you had nothing on below the waist and Mr. Casey had nothing on below the waist, what happens next?

A I don't remember.

Q Did nothing happen?

A He had sexual intercourse with me.

Q Well, I thought you just said you don't remember what happened next.

A It just came back to me that he had sex with me.

Q When did it just come back to you that he had sex with you? Just now, a minute ago?

A Yes.

(*Id.* Ex. K at 93.)

Counsel also cross-examined Melissa concerning her in-court testimony from July 1993 and October 1997. In July 1993, Melissa testified that she could not recall going to petitioner's bedroom or what happened in the bedroom; she could not recall whether she took her clothes off or petitioner did; and she could not recall whether petitioner touched her after her clothes were off. She further testified that when she was talking to the police they made her comfortable and "sometimes suggest[ed] questions to [her] what [she] might say or calls things[.]" (*Id.* Ex. K at 98.) Regarding Melissa's claim that after the incident she was frightened of petitioner, counsel recounted her July 1993 testimony that she was not afraid of petitioner after the alleged assault or at any other time, and did not believe he would hurt her. Regarding her claim that petitioner had intercourse with her, counsel recounted her July 1993 testimony that, while she testified that intercourse took place, she had no idea what that meant. Counsel also recounted that in October 1997, she testified that she was not sure how long petitioner's penis made contact with her vagina.

Q But today you are recalling that almost six years ago Mr. Casey's penis actually entered your vagina. You're recalling that today?

A Yes, because I read the police report.

Q And the police reports suggested to you, did they not, that this may have occurred?

A It did occur.

Q Well, if it did actually occur, why didn't you tell people that it actually occurred when you first testified in the month of July, 1993?

A Because I was 13 and I was scared.

(*Id.* Ex. K at 103.)

Later, counsel asked:

Q [Y]ou don't really remember; do you?

A Not until I read the police reports and the transcript from August, I mean those in October.

Q You have trouble remembering things?

A Yes, I do.

Q Do you have trouble remembering things today?

A Yes, I do.

Q D[id] you have trouble remembering things in October of '97?

A Yeah.

Q And did you have trouble remembering things in July of '93?

A Yes.

Q And isn't it a fact that the reason you have trouble remembering today, six months ago, and five or six years ago, what happened between you and Mr. Casey, if it did ever happen between the two of you—

A Something did happen.

Q You don't really remember what happened?

A Because it's been so long ago.

Q Well, let me just ask you one final question. On July 9th, 1993, which

was a long time from now, but it wasn't very long from September of 1992, do you remember being asked this question and you giving this response: But you don't actually remember that it happened, was the question, and your answer was yes. Do you remember that?

A No.

(*Id.* Ex. K at 105–06.) Melissa also denied that she had a crush on petitioner, that she wrote letters to him or drew pictures for him, or saying that he was her boyfriend.

Lindsey, who was eighteen at the time of trial, testified that on one occasion in September 1992 she accompanied Melissa to petitioner's house, and saw Melissa and petitioner enter the house together. She stated that she went inside to look for Melissa, went upstairs, opened the bedroom door, and observed petitioner and Melissa "[h]aving sex." (*Id.* Ex. K at 116.) She testified that petitioner noticed her at the door and told her to get out. However, rather than leaving, she claimed that she stood there for about five minutes without anything more being said. She stated that she then left the room but quickly turned around and walked back in. She testified that petitioner then grabbed her by the arm and threatened her. Initially, Lindsey testified that she could not see whether petitioner had removed any of his clothing. However, after the prosecutor showed her her prior statement to the police, she stated that petitioner's pants were down and Melissa's shoes were on the side of the bed.

On cross examination, Lindsey stated that she suffered from attention deficit disorder, a cognitive disability. She testified that her condition caused her to have a difficult time remembering things and affected how she perceived and understood things. Lindsey testified that the first time she was in the bedroom she did not

see petitioner touch any part of Melissa's body. When asked whether Melissa touched any part of petitioner's body, Lindsey testified: "Alls [sic] I can tell you is that when I walked in there, I saw them having sex." (*Id.* Ex. K at 138.)

Beth Reimer, a social worker, testified that on December 9, 1992, she and police officer Nofzinger interviewed Melissa and Lindsey, that Melissa told her that petitioner had sexual contact with her in his residence, and that at some point Lindsey walked into the room and petitioner told her to get out. She testified that Melissa reported that petitioner placed his private part in her private part and told her that if she told anyone he would kill her. Reimer testified that during the interview Melissa was upset and crying. Reimer testified that in a separate interview Lindsey said that she walked into the bedroom and saw petitioner on top of Melissa on the bed, and that Melissa's pants, underwear and shoes were on the floor. She testified that Lindsey said that Melissa liked petitioner but denied that either girl stated that Melissa wrote letters to or made drawings for petitioner.

Kristine Kain, Mary Jo's sister, testified that in 1992 she lived with Mary Jo and frequently babysat her children. She testified that Melissa told her how much she (Melissa) liked petitioner, that Melissa wished petitioner was her boyfriend, that she (Kristine) saw letters Melissa wrote to petitioner, and that she noted these facts in a journal she kept. She stated that Melissa continued coming over to the house and expressing her crush on petitioner after the date of the alleged assault.

Mary Jo testified that in 1992 Melissa often came to the house and babysat for her children. She stated that petitioner showed her notes from Melissa, which indicated that Melissa loved him and wanted him to be her boyfriend. She stated that

she threw the letters away and never saw petitioner behave inappropriately toward Melissa or encourage her crush.

Kimberly testified via videotaped deposition that when she was in first grade petitioner sometimes touched her chest, buttocks and private area over and under her clothes with his hands and his private part but did not attempt intercourse. She testified that petitioner told her not to tell because he would get in trouble but did not tell her that she would get in trouble. She could not recall how many times he touched her but agreed with the prosecutor's suggestion of between five and ten.

She also testified that Melissa liked petitioner a lot and wrote letters to him and drew pictures for him. She stated that on one occasion when Melissa came over to give petitioner a picture she had sketched, she (Kimberly) walked into a bedroom, and saw petitioner and Melissa touching each other. She stated that she remained there for one minute then ran out, and did not believe that petitioner or Melissa saw her. She was unsure in which bedroom the conduct occurred.

On cross examination, Kimberly testified that she did not want to move to Oklahoma, that after she made the allegation against petitioner she was removed from her mother's home and placed with her father, and that she was pleased not to be going to Oklahoma. However, she denied accusing petitioner to avoid moving. She testified that petitioner touched her inappropriately five or six times, but acknowledged previously reporting that he had assaulted her "a zillion times." (R. 29 at 35.) She could not recall how many of the assaults involved his hands and how many his penis.

Mark Reich testified that he counseled Kimberly between May and December 1994, that over time she revealed that petitioner had sexual contact with her, and

that this pattern of disclosure was typical of sexual assault victims. He testified that Kimberly said that petitioner told her she would be spanked if she disclosed the sexual contact, that her mother told her to deny the contact because otherwise "they would take us away from her" (Answer Ex. K at 16), and that she initially recanted the allegations because she was afraid she would lose contact with her mother. Reich testified that threats could cause a child to delay disclosure and that victims not infrequently recanted or vacillated after reporting an assault. He said that Kimberly told him that petitioner touched her vagina with his hand and his "wee wee" (*Id.* Ex. K at 19), that at times Kimberly was emotional or tearful, and that she once expressed suicidal thoughts. On cross examination, Reich testified that children sometimes lied about sexual assaults in order to get attention, to get the accused in trouble, or to get a stepparent out of the home. He stated that Kimberly told him that she had been assaulted from one time to a zillion times.

Appleton police officer Chad Leverson testified that on February 13, 1997, he and social worker Lori Hewitt questioned Kimberly, and that Kimberly said that petitioner "rubbed his hands all over her buttocks, vagina and breasts," and "that he had tried to penetrate her vagina with his penis, which she exited the room every time he tried." (*Id.* Ex. K at 43.) Leverson testified that Kimberly said that she was assaulted five to six times, and that petitioner threatened to slap her if she told. Leverson also testified that Kimberly said that she saw Melissa and petitioner in petitioner's bedroom with their clothes off, touching each other's private parts, and that petitioner later "yelled at her to go to her room and they then went into her room and he slapped her all over her body." (*Id.* Ex. K at 46.)

Barbara DeJardin, a former county child protection worker, testified that on March 10, 1994, she and a police officer questioned Kimberly about her allegations, and that Kimberly said that petitioner touched her vaginal area over her clothing, that he took off his clothing and laid on top of her, and that he might have directed her and her younger brother to have sexual contact. Kimberly could not recall when petitioner touched her but thought it was during the summer of 1993. DeJardin indicated that after she talked to Kimberly she was told that Kimberly recanted, that she talked to Kimberly again on March 14, and that Kimberly then said that she told her mother that she had lied because her mother got upset.

On cross examination, DeJardin acknowledged that when she first asked Kimberly if anyone had touched her private parts Kimberly answered "no." She testified that after she discussed the subject with Kimberly further, Kimberly said that petitioner touched her vagina and buttocks once or twice. DeJardin testified that during their second interview, Kimberly recanted but subsequently said that she had done so because her mother called her a liar.

Beth Young–Verkuilen testified that Kimberly did not like talking about petitioner and feared her mother's reaction. She testified that child victims of sexual assault commonly delay reporting, that most "never tell at all," and that those who do tell usually "end up recanting." (*Id.* Ex. K at 154–55, 157.) She testified that it was "possible" a child would lie about a sexual assault, "but it's highly unlikely." (*Id.* Ex. K at 161.)

Kimberly's grandmother, Lois Kain, testified that Kimberly lived with her from December 1993 until February 1994. In January 1994, Kimberly told her that petitioner had touched her "in a naughty way."

(*Id.* Ex. K at 170.) Lois testified that she then told Mary Jo. Later that night or the next day, Kimberly cried and said that she had lied: "Kevin never touched me." (*Id.* Ex. K at 171.) Lois also testified that Kimberly told her that she did not want to move to Oklahoma, and that Mary Jo did not threaten or harass Kimberly between the time she reported the assault and her subsequent recantation.

Mary Jo testified that during the first year that petitioner lived with her and the children, petitioner and Kimberly got along well; she said that Kimberly referred to petitioner as "daddy" before and after they married. (*Id.* Ex. K at 185.) She testified that there was no change in the way Kimberly related to petitioner in the fall of 1992.

Mary Jo stated that in November 1993, she and petitioner first discussed moving to Oklahoma, and that in February 1994 petitioner went to Oklahoma ahead of her. She testified that in March 1994, Kimberly told Lois that petitioner assaulted her, that Lois advised her of Kimberly's statement, and that she tried to discuss the matter with Kimberly, but Kimberly would not give her any details. Mary Jo denied that she called Kimberly a liar and stated that she attempted to discover what happened from Kimberly, "and to this day I do not know of anything that had happened. She has never ever told me anything that had happened." (*Id.* Ex. K at 189.) Mary Jo testified that after reporting the assault, Kimberly cried, and when she asked what was wrong, Kimberly said that she lied to a school social worker about petitioner and that petitioner did not touch her. Mary Jo testified that although she was torn, she believed Kimberly when she said she lied. She had a doctor examine Kimberly, and the examination revealed no evidence of assault.

Charlotte Selig, Mary Jo's cousin, testified that in 1992 and 1993 she lived in Appleton and was employed as a psychologist at the Winnebago Mental Health Institute. She stated that during that time she had regular contact with Kimberly, who frequently confided in her but never said that petitioner assaulted her. Selig said that she never saw petitioner behave inappropriately toward Kimberly.

Finally, petitioner testified in his own defense, and denied touching either girl inappropriately. He stated that Melissa wrote him eight to ten letters expressing her feelings for him, that they made him uncomfortable, and that he asked her to stop. He testified that he showed the letters to Mary Jo, and that Mary Jo advised Melissa's mother of them.

## F. Verdict and Direct Appeal

The jury found petitioner guilty on both counts, and petitioner, represented by new counsel Paul Cornett, appealed. Cornett also did not obtain Bartman's file. On appeal, Cornett argued that the trial court erroneously exercised its discretion by: (1) allowing Kimberly to testify by videotape; (2) shielding petitioner from Kimberly's view while she testified; and (3) excluding evidence of Kimberly's prior and allegedly false sexual assault allegation. The court of appeals affirmed, and petitioner unsuccessfully sought review in the state supreme court.

## G. Post–Conviction Motion

Petitioner next sought a writ of habeas corpus in this court, and I stayed the action so that he could exhaust claims in state court. He then brought a motion in state court under Wis. Stat. § 974.06 alleging that his trial and post-conviction/appellate counsel were ineffective in a number of respects but primarily because they failed to obtain Bartman's file, which contained the witness statements taken by Young that raised questions about the credibility of the allegations against him. The trial court held a hearing on the motion, at which petitioner called a number of witnesses.

Bartman testified that he represented petitioner in 1993 when the district attorney first charged petitioner with assaulting Melissa, and that he assigned Young to investigate the case. He testified that Young interviewed witnesses and prepared reports of the interviews for his case file. He testified that neither Zoesch nor Cornett ever requested a copy of the file orally or in writing. He stated that in a letter dated November 18, 1997, Zoesch requested copies of two documents—Mary Jo Casey's work records and Kristine Kain's journal—but never requested anything else. Young testified that neither Zoesch nor Cornett asked to discuss the case with him.

Zoesch testified that in a case where he succeeded another lawyer, his practice was to obtain the lawyer's case file, but he had no recollection of doing so in petitioner's case. When he was shown a copy of his November 18, 1997 letter, Zoesch acknowledged that he had not requested the whole file, and when he was shown the witness statements obtained by Young he acknowledged that he had never seen them. Zoesch testified that even though his letter to Bartman requested just two specific items, "it would have been normal practice for him to send me what he had." (*Id.* Ex. U at 76–77.)

Cornett testified that he knew that Bartman had a file on petitioner's case, and that it contained witness statements. He testified that he was advised that the file was in storage in Madison and would take several weeks to retrieve. He stated that because the appeal deadline was approaching he went ahead with the appeal without

obtaining the statements. He did not ask the court of appeals for an extension and did not ask petitioner whether he wished to obtain the documents before proceeding. He provided no strategic reason for his decision.

Bartman's file contained a number of witness statements about Melissa's allegation against petitioner.[1] Michael Theabo said that he was an acquaintance of Lindsey's, that he talked to her several times about the alleged assault, and that she told him that Melissa was lying about the assault. Michael said Lindsey went back and forth: when Melissa was not around she said that Melissa was lying, and when Melissa was around she said petitioner was lying. Michael also said that Melissa told him that she was going out with a twenty-four year old, that Melissa thought petitioner was cute, and that he believed she was obsessed with petitioner but that petitioner paid no attention to her, which may have upset her.

Ronald Kain also told Young that Lindsey told him Melissa was lying about the assault. He also related an incident in which Melissa asked him and her brother Dave to pose as her children because she was meeting an older guy and wanted to appear older than she was.

Bartman's file also contained a statement that Kimberly gave to Young. She told Young that Melissa told her that she had sex with petitioner, but that she (Kimberly) did not believe Melissa. Kimberly also told Young that Melissa gave her letters and pictures to give to petitioner.

Sandra Bludau, who at times cared for Mary Jo's children in 1992, told Young that Melissa and Lindsey frequently visited Mary Jo's house. Bludau said that in September 1992, Melissa was "always around" (*Id.* Ex. O at 123) and gave no indication of having been assaulted or of being afraid of petitioner. She stated that Melissa was retarded and that she and Lindsey both swore a lot. She also stated that Mary Jo told her about the notes that Melissa sent to petitioner. Bludau said that she found Melissa's allegation hard to believe. She said that Melissa had a habit of lying, and that she caught Melissa lying one time. She stated that she went to Melissa's house shortly after Melissa first reported the assault, and Melissa first told her that she had been "molested," and about twenty minutes later that she had been "raped." (*Id.* Ex. O at 124.)

Michelle Beard told Young that she was friends with Melissa and Lindsey. She said that on one occasion she visited Melissa's house and heard Melissa and Lindsey discuss how they would testify at an upcoming hearing. Melissa said that she was going to say that petitioner came over to her house, told Lindsey to stay outside with the kids and then raped her. Melissa also indicated that her sister was present when petitioner assaulted her. Michelle related that Lindsey said that she would testify that she looked in the window and saw petitioner and Melissa hugging and that after a while the kids wanted to go in the house, and she took them in and then went upstairs and saw petitioner on top of Melissa. Lindsey said that she would testify that petitioner grabbed her and said, "you bitches best not say anything!" or words to that effect. (*Id.* Ex. O at 125.)

Michelle stated that as Melissa and Lindsey discussed the incident, they each added pieces to the scenario and sounded like they "were trying to get their stories straight so they wouldn't get in trouble." (*Id.* Ex. O at 125.) She said that Melissa

---

1. The state did not object to the admission of the statements at the post-conviction hearing, and both the circuit and appellate courts considered their content.

and Lindsey asked each other what they said to the school liaison officer.

Michelle said that Lindsey repeatedly asked her if she was going to get in trouble because she had to go to court. Michelle replied, "not unless you lie," to which Lindsey replied, "oh" and something to the effect of "I'm not going to lie." (*Id.* Ex. O at 126.) Michelle stated that she had known Lindsey for about one year and that Lindsey was known to lie. Michelle also stated that Lindsey and Melissa were good friends and lied together to stay out of trouble. Michelle provided examples of the girls lying to their parents. Finally, Michelle said that several days ago Lindsey walked up to Kristine Kain in school and said, "If we lose this case, our parents are going to kill Kevin." (*Id.* Ex. O at 126.)

Amie Moderson, a classmate of Lindsey and Melissa, told Young that she heard Melissa ask Lindsey, "What should I say in court?" (*Id.* Ex. O at 129.) Lindsey responded that they would talk about it at lunch. Amie thought that they were trying to get their stories straight. Amie knew Lindsey for about nine years, and said that Lindsey lied. She knew Melissa for about three years, said that Melissa also lied a lot, and that if she (Melissa) did not get her way she acted out until she did. Amie's mother, who was present for the interview, stated that about a year ago Lindsey made obscene phone calls to their house, causing her to call the police. When the police investigated, Lindsey told them that Amie had thrown a book at her, which the police subsequently determined was a lie. Mrs. Moderson said that Lindsey liked being the center of attention.

Mary Joseph, a neighbor, stated that there was a history of sexual acting out in Melissa's family and that Melissa's older sister, Becky, sexually assaulted her (Mary's) daughter, Nicole, when she was three. She also stated that Melissa's older brother assaulted a girl in the neighborhood.

Young also interviewed Kristine Kain, who indicated that she did not believe Melissa's allegation. Kristine stated that Melissa had a crush on petitioner and followed him around. She stated that she saw the notes Melissa wrote to petitioner expressing her love for him. Kristine further stated that in August 1992 Melissa told her that she had sex with an older guy named Kevin (not petitioner). Kristine also said that Lindsey told her that Melissa said that petitioner raped her, but did not mention having witnessed the incident. Kristine said that she then spoke to Melissa, who told her that petitioner raped her but was laughing when she said it. Kristine believed that Melissa was making it up, but not necessarily by herself. She said that petitioner tried to stay away from Melissa, but Melissa followed her (Kristine) around and thus got into petitioner's house. Kristine also confirmed that Lindsey told her that if they lost the case, Melissa's and her parents would kill petitioner.

Young also interviewed Lindsey, who said that she saw petitioner on top of Melissa, and Melissa's pants were off. Petitioner said, "if you say anything, I'll kill you," and told her to go back outside. Lindsey said that about twenty minutes later Melissa came back outside. Lindsey denied telling Ronald Kain that Melissa was lying. In response to Young's question about the other Kevin Melissa said she had sex with, Lindsey replied that Melissa told her that he had AIDS.

## H. Appeal of Post–Conviction Motion

The circuit court denied petitioner's motion from the bench, and petitioner appealed. The court of appeals affirmed. Re-

garding the witness statements counsel failed to discover, the court said:

> The evidence consists of several witnesses' statements that Melissa has a character for untruthfulness and that she and Lindsey discussed the case in 1993 and gave the impression that they were trying to "get their stories straight." These witnesses' statements were given to a private investigator [sic [2] ] in 1993 but were not turned over to Kevin's 1997 counsel. Kevin's counsel was not deficient for failing to discover these statements. He requested the file from Kevin's previous attorney and received some documents. He had no reason to know that additional documents existed. The trial court correctly ruled that counsel adequately represented Kevin when his performance was measured against prevailing professional norms. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.
>
> Kevin has not established that the statements constitute "newly discovered evidence." To be newly discovered, the evidence must have come to his knowledge after trial, without negligence on his part. It must be material and not cumulative, and the result of the trial must probably have been different if the evidence had been presented. *See State v. Boyce,* 75 Wis.2d 452, 457, 249 N.W.2d 758 (1977). Kevin overstates the significance of these statements when he describes them as "exonerating witness statements." The witness who overheard Melissa and Lindsey discussing their testimony went on to say that Lindsey told Melissa "I'm not going to lie." Other witnesses' statements would not be admissible as they merely show the witnesses' assessment of the evidence. At trial, Kimberly's reputation for untruthfulness was appropriately ex-

amined through her mother's, grandmother's and aunt's testimony. The statements were cumulative and would not have affected the verdicts.

(*Id.* Ex R. at 7–8.)

Petitioner unsuccessfully sought review of the appellate court's decision in the state supreme court. Subsequently, I vacated the stay of his habeas corpus petition, and the parties submitted briefs. Respondent acknowledges that petitioner's ineffective assistance of counsel claims have been fully exhausted and may be decided on the merits.

## II. STANDARD OF REVIEW

■ Under the Anti–Terrorism and Effective Death Penalty Act ("AEDPA"), a writ of habeas corpus may be granted if the state court decision on the merits of the petitioner's claim (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that reached by the Supreme Court]." *Williams v. Taylor,* 529 U.S. 362, 405, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). An "unreasonable application" of Supreme Court precedent occurs when "the state court identifies the correct governing legal rule . . .

---

2. Young was not a private investigator. He worked in the public defender's office.

but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389; *see also Jackson v. Miller,* 260 F.3d 769 (7th Cir.2001). *Dixon v. Snyder,* 266 F.3d 693, 700 (7th Cir.2001) (footnote omitted; alteration in original). The federal habeas court reviews the state court's legal conclusions de novo under § 2254(d), but in order to issue a writ of habeas corpus must conclude that the state court's decision was both incorrect and unreasonable. *Id.; see also Williams,* 529 U.S. at 411, 120 S.Ct. 1495 (holding that the term "unreasonable" in § 2254(d)(1) is not synonymous with "erroneous" or "incorrect"); *Ward v. Sternes,* 334 F.3d 696, 703 (7th Cir.2003) (stating that under § 2254(d) habeas court's "task is to uphold those outcomes which comport with recognized conventions of legal reasoning and set aside those which do not").

▮▮▮ However, the standards provided in § 2254(d)(1) and (2) only apply to a "claim that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d); *see Braun v. Powell,* 227 F.3d 908, 916 (7th Cir.2000). A state court decision cannot be viewed as an " 'adjudication on the merits' " if the state court failed to resolve all determinative issues of

federal law, either because they were not before the state court or because the state court's framing or analysis of the claim omitted one or more dimensions of the requisite federal constitutional analysis. Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 32.2, at 1423–24 (4th ed.2001) (quoting 28 U.S.C. § 2254). In such a situation, the court simply asks whether the petitioner is in custody in violation of the Constitution or laws of the United States under § 2254(a). *Aleman v. Sternes,* 320 F.3d 687, 690 (7th Cir.), *cert. denied,* 539 U.S. 960, 123 S.Ct. 2653, 156 L.Ed.2d 659 (2003). Whether the petitioner's custody violates the Constitution depends (1) on whether substantive constitutional rules were respected, and (2) on whether, if a constitutional error was committed, it was the cause of his custody, i.e. whether it had a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)).

## III. DISCUSSION

Petitioner alleges that both his trial counsel and his post-conviction/appellate counsel[3] were ineffective. His principal claim is that by failing to obtain the statements in Bartman's file, counsel failed to adequately investigate the facts of the case and to call witnesses who would have undermined the credibility of his accusers.[4] I now turn to that claim.

---

**3.** In state court petitioner did not challenge the effectiveness of his appellate counsel by bringing a petition under *State v. Knight,* 168 Wis.2d 509, 484 N.W.2d 540 (1992). Rather, he brought a § 974.06 motion as contemplated by *State ex rel. Rothering v. McCaughtry,* 205 Wis.2d 675, 556 N.W.2d 136 (Ct.App. 1996), alleging that post-conviction counsel was ineffective for failing to raise the issue of trial counsel's ineffectiveness. Because the basis for his challenge to the effectiveness of both trial and post-conviction/appellate coun-

sel rests on the same underlying facts, I need not address the performance of post-conviction counsel unless I first determine that trial counsel was ineffective. In other words, if trial counsel was not ineffective then post-conviction counsel was not ineffective for failing to argue that he was.

**4.** Petitioner also alleges that counsel was ineffective for failing to move to dismiss the charge regarding Melissa on the ground that it was previously dismissed; failing to object

In order to sustain a claim of ineffective assistance of counsel, petitioner must establish (1) that counsel's performance was deficient and (2) that as a result he suffered prejudice. *Strickland v. Washington,* 466 U.S. 668, 686–87, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To show deficient performance, he must identify acts or omissions that were not the result of reasonable professional judgment. *Id.* at 690, 104 S.Ct. 2052. To show prejudice, he must establish a reasonable probability that, but for counsel's errors, the result of the trial would have been different. A reasonable probability is one that undermines the court's confidence in the outcome. *Id.* at 694, 104 S.Ct. 2052.

## A. Performance

■ Regarding performance, the state court of appeals ruled:

> Kevin's counsel was not deficient for failing to discover these statements. He requested the file from Kevin's previous attorney and received some documents. He had no reason to know that additional documents existed. The trial court correctly ruled that counsel adequately represented Kevin when his performance was measured against prevailing professional norms. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

*(Id.* Ex. R at 7.)

The court's assertion is contrary to the evidence in the record. Bartman testified that Zoesch did not request a copy of petitioner's file, and Young testified that Zoesch did not ask him about petitioner's

case. Zoesch testified that it was his practice to request a case file from predecessor counsel but acknowledged that he did not do so in petitioner's case. His only request to Bartman was a November 18, 1997 letter in which he asked for two documents, Mary Jo's work records and Kristine Kain's journal, and he acknowledged that he did not obtain copies of the witness statements. The circuit court found that Zoesch failed to request the file and that such failure "was an oversight. There's no question about it." [5] (*Id.* Ex. V at 88.) Thus, the appellate court's finding that Zoesch requested the file was an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2).

There is no evidence in the record that Zoesch failed to request the file for strategic reasons. Thus, I must determine whether his failure constituted deficient performance. *See Pavel v. Hollins,* 261 F.3d 210, 216 n. 7 (2d Cir.2001) (citing *Kimmelman v. Morrison,* 477 U.S. 365, 385, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)) (stating that where counsel's inaction was not based on strategic considerations, court must determine whether counsel's conduct fell below prevailing professional norms). I conclude that by failing to obtain Bartman's file (or learn of the witnesses Young interviewed through other means) Zoesch failed to adequately investigate petitioner's case, and that his inaction fell below prevailing professional norms.

The duty to investigate derives from counsel's basic function of making the ad-

---

to proceeding on the state's motion in limine in his absence; failing to preserve for appeal the record of Kimberly's prior assault allegation; failing to challenge on Confrontation Clause grounds hearsay testimony admitted at the preliminary hearing; failing to object to the admission of Kimberly's alleged prior consistent statements; failing to verify his crimi-

nal record; failing to have him testify as to his willingness to take a polygraph examination; and failing to challenge Kimberly's videotaped testimony on the ground that she did not understand the oath.

**5.** The circuit court resolved the claim on the prejudice prong.

versarial testing process work. *Kimmelman,* 477 U.S. at 384, 106 S.Ct. 2574. The process will not work if counsel fails to conduct a reasonable investigation or to make a reasonable decision that a particular investigation is unnecessary. *Id.* (citing *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052); *see also Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Williams,* 529 U.S. at 396, 120 S.Ct. 1495.

 The duty to investigate includes the duty to locate exculpatory witnesses, and it is well-established that the failure to do so "can amount to ineffective assistance of counsel." *United States ex rel. Hampton v. Leibach,* 347 F.3d 219, 236 (7th Cir.2003) (citing *Washington v. Smith,* 219 F.3d 620, 631–32 (7th Cir.2000); *Williams v. Washington,* 59 F.3d 673, 681 (7th Cir. 1995); *Harris v. Reed,* 894 F.2d 871, 878–79 (7th Cir.1990); *Sullivan v. Fairman,* 819 F.2d 1382, 1389 (7th Cir.1987)). Counsel's failure to obtain predecessor counsel's investigative reports can also violate the duty to reasonably investigate. *See, e.g., Martin v. Rose,* 717 F.2d 295, 296 (6th Cir.1983) (finding ineffective assistance where counsel ignored contents of an investigative file assembled by the public defenders' office which had previously represented defendant); *see also Brown v. Sternes,* 304 F.3d 677, 692 (7th Cir.2002) (holding that "the attorney must look into readily available sources of evidence").

Zoesch's failure to obtain the file or locate the exculpatory witnesses was unprofessional under the circumstances. *See Pavel,* 261 F.3d at 221 ("In [child sex abuse] cases, it should be perfectly obvious that it will almost always be useful for defense counsel to speak before trial with readily-available fact witnesses whose non-cumulative testimony would directly corroborate the defense's theory of important disputes.").

 The state appellate court's suggestion that Zoesch's failure to request the file was excusable because he "had no reason to know that additional documents existed," (*Id.* Ex. R at 7), is unpersuasive. A failure to investigate is not excused because it is not known in advance what will be found. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052. That is precisely the reason to investigate. A lawyer must request a file to discover what documents it contains. In the present case, it was particularly important for counsel to obtain whatever evidence Bartman possessed. This is so because Bartman represented petitioner in 1993 not long after the incident in question allegedly occurred and at a time when witnesses' memories would have been fresher than they were five years later.

 Zoesch's suggestion that his request for two documents should have caused Bartman to produce whatever he had that was helpful is also unpersuasive. Bartman was a busy public defender and could not have been expected to send Zoesch information from a five year old file that Zoesch did not request. Moreover, even if lawyers sometimes respond to requests for specific documents by providing other documents, this does not mean that Zoesch's performance was not deficient. As the court noted in *Washington,* a lawyer's ineffectiveness cannot be condoned based on the incantation that what he did was the "usual" manner of conducting business. 219 F.3d at 629–30; *see also Crisp v. Duckworth,* 743 F.2d 580, 587 (7th Cir.1984) (contrasting an attorney's general policy of how to defend a case with "strategic decisions," which are "decisions based on the specific facts of a given case"); *cf. Kimmelman,* 477 U.S. at 385, 106 S.Ct. 2574 ("Counsel's failure to request discovery, again, was not based on 'strategy,' but on counsel's mistaken be-

liefs that the State was obliged to take the initiative and turn over all of its inculpatory evidence to the defense[.]").

■ Thus, by failing to request or obtain Bartman's file, Zoesch performed deficiently, and the court of appeals's determination to the contrary was unreasonable. I must therefore determine whether Cornett also performed deficiently by failing to obtain Bartman's file and raise the issue in a post-conviction motion.[6] Cornett's testimony reveals that he knew that Bartman's file contained witness statements but that he chose to proceed with petitioner's appeal without seeing them. Such conduct was objectively unreasonable. A lawyer may not make a strategic decision of such significance without conducting an investigation. *See Kimmelman,* 477 U.S. at 385, 106 S.Ct. 2574 (noting that a decision based on ignorance of the facts cannot be "strategic"); *Washington,* 219 F.3d at 632 (holding that counsel's failure to attempt to ascertain what exculpatory evidence witnesses might have was a flagrant example of ineffective assistance); *Montgomery v. Petersen,* 846 F.2d 407, 413 (7th Cir.1988) (stating that counsel has a duty to contact a potential witness unless counsel can make a rational decision that investigation is unnecessary). The decision Cornett made in the present case—not to explore the significance of the statements in Bartman's file—"was necessarily one made after an incomplete investigation." *Hampton,* 347 F.3d at 249.

Even assuming that he faced a deadline to submit something to the court of appeals, Cornett could have asked for an extension based on his need to obtain Bartman's file; such requests are routinely granted. *See* Michael S. Heffernan, *Appellate Practice and Procedure in Wisconsin* § 19.29, at .34 (2003) ("The court of appeals has a generally lenient policy about granting extensions that will enable a criminal defendant to prosecute an appeal."). However, he made no such request nor did he discuss the matter with petitioner.[7] Thus, like Zoesch, Cornett performed deficiently by failing to investigate petitioner's case. *See Pavel,* 261 F.3d at 220 (stating that "an attorney's failure to present available exculpatory evidence is ordinarily deficient, unless some cogent tactical or other consideration justified it"); *Williams,* 59 F.3d at 681 (finding deficient performance where counsel failed to interview witnesses who could have undercut alleged victim's credibility).

## B. Prejudice

■ As noted, in order to establish prejudice, petitioner must show that but for his lawyers' errors there is a reasonable probability—a better than negligible likelihood—that the outcome of the case would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *Hampton,* 347 F.3d at 256. To satisfy this standard in the present case, petitioner must demonstrate what the missing witnesses would have said and how their testimony could have affected the outcome of the case. *See, e.g., United States v. Farr,* 297 F.3d 651, 658–59 (7th Cir.2002); *United States v. Rodriguez,* 53 F.3d 1439, 1449 (7th Cir. 1995); *Granada v. United States,* 51 F.3d 82, 85 (7th Cir.1995); *United States ex rel. Partee v. Lane,* 926 F.2d 694, 701 (7th Cir.1991); *United States v. Balzano,* 916 F.2d 1273, 1296 (7th Cir.1990); *Crisp,* 743 F.2d at 588.

---

6. The state court of appeals did not address Cornett's effectiveness because it concluded that Zoesch was not ineffective. Thus, AEDPA does not apply.

7. Petitioner, himself, was the first person to request Bartman's file, which he did after he had been convicted and his conviction affirmed.

The state court of appeals concluded that Zoesch's failure to call the witnesses Young interviewed was not significant because their statements were less valuable than petitioner believed, some of the statements were inadmissible, and the evidence was cumulative. The court wrote:

Kevin overstates the significance of these statements when he describes them as "exonerating witness statements." The witness who overheard Melissa and Lindsey discussing their testimony went on to say that Lindsey told Melissa "I'm not going to lie." Other witnesses' statements would not be admissible as they merely show the witnesses' assessment of the evidence. At trial, Kimberly's reputation for untruthfulness was appropriately examined through her mother's, grandmother's and aunt's testimony. The statements were cumulative and would not have affected the verdicts.

(*Id.* Ex. R at 7–8.)

I first note that the state court of appeals did not specifically engage in a prejudice analysis under *Strickland*. Rather, it analyzed the content of the witness statements in the context of addressing petitioner's argument that the statements constituted newly discovered evidence under state law. Thus, the state court's framing of the issue omitted one dimension of the federal constitutional analysis, and its decision was likely not an "adjudication on the merits" of the prejudice issue. Hertz & Liebman, *supra*, § 32.2. Thus, it is debatable whether AEDPA applies to the court's determination on this point. However, because the court's state law inquiry arguably amounted to a prejudice inquiry, *cf. Mitchell v. Esparza*, 540 U.S. 12, 16, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003) (noting that a state court need not cite or even be aware of Supreme Court precedent for AEDPA to apply), and because the court's

determination does not withstand scrutiny even under AEDPA's deferential standard of review, I will apply the AEDPA standard to the court's determination.

■ The court of appeals turned a blind eye to the potential impact of the witnesses who gave statements to Young on the outcome of the case. In its cursory discussion of prejudice, the state court failed even to mention most of the statements, much less analyze their potential significance. The critical issue in the case was credibility, and a number of the statements severely undercut the credibility of the state's principal witnesses, Melissa, Lindsey and Kimberly. Moreover, under Wisconsin law, many of the statements, including the most important of them, would have been admissible. Finally, none of the statements were cumulative.

First and probably most important, the court of appeals ignored the statements of Michael Theabo and Ronald Kain that Lindsey, who testified at trial that she observed petitioner assault Melissa, told them that Melissa's allegation was a lie. Although Michael said that Lindsey vacillated on whether Melissa or petitioner was lying (depending on whether Melissa was present), he stated that Lindsey told him more than once that Melissa was lying. Ronald also stated that Lindsey told him that Melissa was lying. Lindsey's statements to Michael and Ronald that Melissa was lying directly contradicted her trial testimony that she witnessed the assault. Further, when interviewed by Young, Lindsey denied telling Ronald that Melissa was lying. Thus, Lindsey's admissions to Ronald and Michael would have been admissible as prior inconsistent statements. *See* Wis. Stat. § 906.13.

Moreover, there is a more than negligible chance that such statements would have affected the outcome of the trial because they would have undercut the credi-

bility of the state's major witnesses on the principal question at issue. Testimony that the state's key eye witness told others that the alleged victim was lying about the assault could have been critical to petitioner's defense. Had the jury heard Michael and Ronald testify that Lindsey said Melissa was lying they may have viewed the credibility of these two girls much differently. *See Williams*, 59 F.3d at 681–82.

The court of appeals also failed to address the significance of Kimberly's statement to Young that she did not believe Melissa's allegation. Kimberly's statement directly contradicted her trial testimony that she witnessed the assault. This is so because if she witnessed the assault she would not have expressed disbelief that it happened. Thus, her statement would have been admissible to impeach her testimony and would have further undermined the credibility of Melissa's allegation.

The court of appeals also failed to discuss other testimony that might reasonably have affected the jury's verdict. Michelle Beard said that she heard Melissa tell Lindsey that she was going to testify that the assault occurred at her house and that her sister was present when it occurred. Both statements directly contradicted Melissa's trial testimony that petitioner assaulted her at his house and that made no mention of her sister. Thus, these statements of Melissa's would have been admissible and might well have damaged her credibility. Michelle also said that she heard Melissa and Lindsey adding pieces to what they intended to say in court, which caused her to conclude that they were trying to get their stories straight. Likewise, Amie Moderson heard Melissa and Lindsey comparing notes and trying to get their stories straight. While Michelle's and Amie's conclusions would probably not have been admissible, the statements on which they based the conclusions could have been, and the jury might well have drawn the same inferences that they did.

The court of appeals also ignored the fact that a number of witnesses stated that Melissa or Lindsey or both had poor reputations for truthfulness. Michelle Beard said that both girls were liars and lied together to stay out of trouble. Sandra Bludau said that Melissa had a habit of lying. Amie Moderson and her mother both said that Lindsey was untruthful, and related an incident in which Lindsey lied to the police. Such testimony would have been admissible. *See* Wis. Stat. §§ 908.03(21) & 906.08(1). Moreover, it would have cast further doubt on the credibility of Melissa and Lindsey. *See Williams*, 59 F.3d at 677, 681 (finding ineffective assistance where attorney "did not call witnesses who would have cast doubt on [alleged victim's] reputation for truthfulness, though her school files characterized her as 'an inveterate liar' and suggested that she 'had a problem telling the truth' ").

The court of appeals also ignored Bludau's statement that Melissa was "always around in September" and showed no fear of petitioner. This statement directly contradicted Melissa's testimony that after the assault she was afraid of and avoided petitioner.[8] The court also ignored Kristine Kain's statements that when Melissa told her that petitioner assaulted her she was laughing, and that when she said she was going to court she appeared to be attempting not to laugh.[9] These eye-wit-

---

**8.** As the trial judge noted, in 1993 Bludau was living in Texas. However, there is no indication that she could not have testified in 1998 when the trial was held.

**9.** Counsel called Kristine Kain as a witness at

ness observations would have been admissible and might well have created additional doubt in the jury's mind.

Finally, the court of appeals failed to address the statements by Michelle Beard and Kristine Kain that Lindsey said that her parents and Melissa's parents would be very angry if petitioner prevailed in the case. These statements were relevant to whether Melissa and Lindsey had a motive to lie and might have suggested to the jury that their testimony was motivated by fear of their parents.[10]

None of these statements were "cumulative" of the testimony of Kimberly's mother, grandmother and aunt, as the state court claimed. This is so because the statements related primarily to *Melissa's* allegation, not Kimberly's. Counsel presented no witnesses attacking Lindsey's credibility and just one (Kristine Kain) attacking Melissa's. *See Moffett v. Kolb*, 930 F.2d 1156, 1161 (7th Cir.1991) (stating that counsel's failure to impeach witness rendered part of trial testimony "completely trustworthy").

But more importantly, not only was the state court's "cumulative" reference factually baseless, it reflected a misunderstanding of the term. In fact, its error is similar to the one committed by the state court in *Washington*. In that case, the state court characterized as "cumulative" testimony from additional alibi witnesses. In affirming the grant of habeas relief, the Seventh Circuit stated:

> Evidence is cumulative when it "supports a fact established by existing evidence," *Black's Law Dictionary* 577

(7th ed.1999), but Washington's whereabouts on the day of the robbery was far from established—it was *the* issue in the case. The fact that [one witness] had already testified to facts consistent with Washington's alibi did not render additional testimony cumulative. Indeed, the additional testimony of [three others]—none of whom could have been impeached as having a criminal record—would have added a great deal of substance and credibility to Washington's alibi. *See Montgomery v. Petersen*, 846 F.2d 407, 411–15 (7th Cir.1988) (finding counsel ineffective for not calling additional disinterested alibi witnesses not subject to the same impeachment as family members); *Crisp v. Duckworth*, 743 F.2d 580, 585 (7th Cir. 1984) (finding that "[h]aving independent witnesses corroborate a defendant's story may be essential" and "testimony of additional witnesses cannot automatically be categorized as cumulative").

219 F.3d at 634. In the present case, credibility was *the* issue. The testimony counsel failed to produce could have been critical in persuading a jury that the allegations against petitioner were not sufficiently convincing.

Thus, there is more than a negligible chance that the statements counsel failed to obtain would have affected the outcome of the trial. As discussed, Michael Theabo's and Ronald Kain's statements would have raised the question of whether Lindsey's testimony that she witnessed the as-

---

trial, but because he was unaware of her statement to Young he did not present the information in the statement to the jury.

**10.** The court of appeals also ignored the statement of Mary Joseph that there was a history of sexual acting out in Melissa's family. While this statement would probably have not

been admissible, it might have prompted counsel to engage in additional investigation. *See Washington*, 59 F.3d at 681–82 (noting that even though evidence counsel failed to discover may not itself have been admissible, it could have been used to develop leads on the credibility issues involved).

sault was false. And, as discussed, these statements and others raised the question of whether Melissa was a credible witness. It is also significant that the witnesses who most directly undercut Melissa's and Lindsey's testimony, such as Michael Theabo, Ronald Kain and Michelle Beard, appear to have been disinterested, unlike the family members who testified for petitioner at trial. See Williams, 59 F.3d at 682 (stating that "in a credibility contest, the testimony of neutral, disinterested witnesses is exceedingly important"). The court of appeals failed to address the significance of the statements, and its conclusion that counsel's deficient performance did not affect the outcome of the trial was unreasonable. See Earls v. McCaughtry, 379 F.3d 489, 495 (7th Cir.2004) ("We have previously held that when a trial comes down to a single issue such as the credibility of a witness, deficient performance by defense counsel regarding that credibility issue may cause prejudice.").

The prejudice caused by counsel's failure was not confined to the count regarding Melissa. As noted, one of the statements in Bartman's file was Kimberly's statement that she did not believe that petitioner assaulted Melissa in 1992. This statement directly contradicted Kimberly's trial testimony that she witnessed petitioner assault Melissa in 1992. If she did not believe that petitioner assaulted Melissa in 1992, she could not have witnessed the assault. Her statement would have been admissible as a prior inconsistent statement. Further, the contradiction between Kimberly's statement regarding the assault on Melissa and her trial testimony was so stark that it is reasonably likely that it would have affected the jury's assessment of her credibility. Moreover, because she made the statement to Young at a time much closer to the incident than when she testified at trial, it is not unlikely that the jury would have concluded that

her trial testimony was a lie. Further, if the jury decided that her testimony that petitioner assaulted Melissa was a lie, it is reasonable to conclude that it would also have had doubts about the credibility of her allegation that petitioner assaulted her.

Kimberly's statement that she did not believe that petitioner assaulted Melissa might well have raised other questions in the jury's mind. The jury might have reasonably concluded that at some point, in Kimberly's mind, her own claims against petitioner and those of Melissa had become linked. It might also have concluded that Kimberly, who was surely aware of the details of Melissa's 1993 allegation, added a new twist—that she had witnessed the assault of Melissa—to lend credibility to her own renewed allegation.

The introduction of Kimberly's statement would also have highlighted other contradictions in her trial testimony. For example, Kimberly testified at trial that when she witnessed petitioner assault Melissa, she walked into the bedroom, remained there for one minute, ran out, and did not believe that petitioner or Melissa saw her. Yet Officer Leverson testified that Kimberly told him that she saw petitioner and Melissa touching each other and that petitioner saw her and "yelled at her to go to her room and they then went into her room and he slapped her all over her body." (Id. Ex. K at 46.) If Kimberly's statement that she did not believe that petitioner assaulted Melissa had been introduced, the jury would have heard from Kimberly three substantially different accounts of the same event: (1) that she didn't believe it happened; (2) that she saw it but no one, including petitioner, knew that she did; and (3) that she saw it and petitioner knew that she saw it and later punished her for doing so. These

discrepancies might also have affected the jury's assessment of her credibility.

Moreover, the charges involving Melissa and Kimberly were so closely intertwined that it is impossible to reasonably conclude that counsel's deficient performance was prejudicial as to one charge but not the other. In fact, Kimberly's 1997 statements that petitioner assaulted her and that she witnessed him assault Melissa caused the district attorney to revive the 1993 charge involving Melissa and to charge petitioner with assaulting Kimberly, a charge that he had declined to bring in 1994. The charges were also intertwined because, according to the statement Kimberly gave Young, Melissa and Kimberly discussed petitioner's alleged assault of Melissa.

It is also significant that the district attorney and the trial court considered the charges to be closely interconnected. In opposing petitioner's severance motion, the district attorney argued that the charges involving Melissa and Kimberly should be tried together because the allegations were similar in type and time, because Kimberly was an important witness on both counts, and because petitioner's .conduct as charged in each count was evidence of his intent to commit the acts alleged in the other count. In denying petitioner's motion for severance, the trial court endorsed the district attorney's reasoning. For this reason also counsel's deficient performance prejudiced petitioner with respect to the charge involving Kimberly.

For the foregoing reasons, the court of appeals's conclusion that petitioner's counsel's defective performance was not prejudicial was unreasonable.[11]

11. Based on my resolution of petitioner's primary ineffective assistance claim, I need not address his other claims.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that petitioner's application for a writ of habeas corpus is **GRANTED,** and that petitioner be released within 120 days of the date of this decision unless the state decides to retry him.